Thank you. Next we have Payne v. Fulton. Good morning, Your Honors. May it please the Court, my name is Andrea Coit. I represent the defendants in this case, Deputy Connor Santini and Lane County Deputy Zachary Fulton. I'd like to reserve two minutes for my rebuttal, if possible. We are before the Court on an appeal from the denial of qualified immunity to our two deputies. It is our position in this appeal that the District Court applied the wrong test, the wrong analysis when evaluating whether the force that was used by Deputies Santini and Fulton was objectively reasonable as a matter of law. The District Court purported to analyze Mr. Payne's of excessive force under the Fourteenth Amendment. Mr. Payne was in the Sally Port of the Lane County Jail, having already been seized by the Eugene Police Department when he was delivered to our facility. Under Supreme Court precedent and this Court's precedent, it is our position that the Fourteenth Amendment was the correct analysis to apply. The plaintiff in this case disagrees, arguing that the Fourth Amendment continues to apply to Mr. Payne while he was at the Lane County Jail. But from my reading of the cases from the Circuit and from the U.S. Supreme Court, it appears that the test itself is the same, regardless of whether we're looking at the Fourth or the Fourteenth Amendment. We look at whether the force that was used in this situation was objectively reasonable under the circumstances. Counsel, could I ask you a procedural question? Yes. In order for us to have appellate jurisdiction in a qualified immunity appeal, there can be no genuine issues of material fact that we're resolving. We don't do that. So in the typical case, you, the movement, have to assume the opposite parties the truth of the that changes because of the Supreme Court's Scott v. Harris opinion that allows us to look at things such as the Sally Port video, the body cam video, where that gives an undisputed picture of what occurred. What's your position on that? Thank you for the question, Judge. Our position on that is that under the Scott v. Harris case, the Supreme Court has said that video evidence is undisputed evidence. And so when we have clear video evidence, as we do in this case, you don't have, the court does not take the facts in the light most favorable to the non-moving party. They take it in the light shown by the video evidence. My understanding is the district court had the video, correct, and said even viewing the video, and my understanding is the district court understood that, said viewing the video that established certain undisputed facts like timing, place, but said even viewing the video, there's genuine factual disputes. And then resolved those said, and then did the analysis saying, assuming those factual disputes are resolved in favor of the non-moving party, here's my qualified immune analysis. That is the same analysis we're supposed to engage in now. Is that correct? I agree with your recitation of what happened, what the district court found. It is our position on appeal that the district court considered disputed facts that are not material to this case when the proper analysis is used. And I'll explain that with your indulgence. I am not here asking this court to find that any of the facts that the court either found against us or found were disputed were, in fact, not disputed. We are not asking for any change in factual findings. It is our position that the facts that the court considered and said there's a disputed issue of material fact, for instance, on whether Mr. Payne, at the time he was in the custody of the Lane County sheriffs, whether he was actively resisting, passively resisting, or was resisting moving about because he was struggling for breath. Under the test that should apply in this case, the 14th Amendment, where we look to see if the force that was used under these circumstances was rationally related to achieve a legitimate government interest, it doesn't matter why he was moving. So that fact, be it disputed or not, is not material to the proper analysis. Let me just try to nail down the standard and the construct here. Because when you filed your initial brief, we're talking about the Fourth Amendment. And then, at least in the district court, I should say, we're talking about the Fourth Amendment. And then in your brief, you're saying, well, no, we're not really doing that. We're talking about this as a pretrial detainee, and now you're saying it's the 14th Amendment. Do I have the timing right of how this argument has evolved? We've always taken the position that Mr. Payne was subject to a 14th Amendment analysis. We may have stated in the brief, even assuming the Fourth Amendment applies as the plaintiff contends, that the analysis is the same. Was it objectively reasonable under the facts of this case? But in the district court, it's analyzed as a Fourth Amendment violation, and that's a reasonable misstandard, right? The district court, yes. The district court said that he was using, excuse me, the court was using a 14th Amendment analysis, but then the actual analysis that was used in the decision was a Fourth Amendment analysis. All right, thank you. And what is your authority for the proposition that the reason the defendant may have been moving, excuse me, why Mr. Payne may have been moving was completely irrelevant to the totality of the circumstances analysis under the 14th Amendment? Okay. So in the Kingsley v. Hendrickson U.S. Supreme Court case, the court explained that the objective reasonableness of force used against a pretrial detainee must account for the legitimate interests that stem from the government's need to run a facility in which the individual is detained. So the court must appropriately defer to the policies and the practices of the jail that it believes are needed to preserve the internal order and security. Now, the court in Kingsley citing to Bell v. Wolfish explained the 14th Amendment protects a pretrial detainee from excessive force that amounts to punishment, and the detainee can prove this force is excessive by showing that the actions are not rationally related to a legitimate, nonpunitive purpose or that they appear excessive in relation to that purpose. So in this case, undisputed facts, Mr. Payne is handcuffed when he arrives at the Lane County Jail. He's in the back of the car. He is admittedly incoherent, nonresponsive. When he's delivered to the jail, the time frame here is also important under the facts and circumstances of this case. Mr. Payne arrives at the Lane County Jail on March 27th of 2020. This is the height, well, it's the beginning of COVID, and the Lane County Jail had implemented that day, was the first day of its revised COVID policies, that every person who is brought to the jail must be temperature screened before they're brought in. And we've seen the video in the court, I think correctly laid out the timing after Mr. Payne's temperature was taken, continued to be body force pressure applied to his back for approximately a minute or more. Why was that necessary at that point? Thank you, Your Honor. So the other policy that is material here, again undisputed that this was a policy of the Lane County Jail, was that any person who is either reported to be combative or observed to be combative when they're brought to the jail will be placed in leg restraints before they are taken into the jail and subjected to the medical staff's medical screening. It is a safety issue, and under Kingsley, it is entitled to deference. The jail is allowed to enforce its policies. So in the video, we see Deputy Santini, he's the one that initially had a knee on Mr. Payne's lower right side of his back. Immediately, the deputy across from him, across from Mr. Payne's body, Deputy Pfeiffer said, get your knee off his back, and Deputy Santini immediately responded. It was 17 seconds that the knee was on the back. That is not evidence of an intent to punish. So under the 14th Amendment, we're looking at whether or not it was reasonable for them to guide him to the ground, hold him in that position, and the longer use of the force to hold him still with Deputy Fulton's hand on the man's head, on Mr. Payne's head, and his knee on the top shoulder, was because they were still trying to put the leg restraints on. From the video, you can see the entire time, the 90-second period in which Mr. Payne is laid on the ground until he suffers the cardiac arrest, the deputies at his feet are still trying to put on the leg restraints. So was their decision, our deputy's decision to maintain the pressure to hold him still, was that rationally related to the objective of getting those leg restraints on? But that has to be within the context where the deputies were on notice that the use of that type of pressure on his back was risking seriously bodily injury or death, correct? Yes, absolutely. Had they had they done some of the actions that are seen in the cases that were relied on by the district court to deny qualified immunity on the second prong, a drumming for example, had they actually sat on his back or put, held down his neck or done something that showed that they were not doing, they were not using force for the purpose of This was a punitive action that was being taken. There's no evidence of that in this record. A mistake of putting a knee on a back, it's immediately corrected as soon as it's pointed out. That is not evidence of an intent to harm Mr. Payne. And under the 14th it's going to be excessive. And you can show that by showing that the force they used was not rationally related to these two objectives. First, getting the temperature and second, putting on the leg restraints. Nothing from the video or from the testimony of these two deputies or the rest of the deputies supports any sort of finding by a rational juror. By your argument, even greater force would be no problem as long as it was in service of that objective. I don't think that's the standard, correct? No, and I agree with that. It must be rationally related to a legitimate non-punitive purpose or that the actions appear excessive in achieving that purpose. And under the scenario where we have a drumming case, had that occurred in a facility against a pretrial detainee, those actions most likely would have been, appear excessive, even if in furtherance of a legitimate need of the jail. So it's our position on the first prong that had the court applied the 14th analysis test. Well, I guess my question comes back to why was pressure on his back, knowing the risk that such pressure could lead to serious bodily injury or death, necessary to achieve the objective? And that's assuming it's a legitimate objective at this point to either take his temperature or put on the leg shackles. Why was pressure on his shoulder, on his torso necessary to achieve that objective? Your Honor, it wasn't. It certainly wasn't necessary, but was it reasonable? Was it rationally related? I mean, that's the standard we're looking at. I don't believe the facts is found by the district court or that found to be disputed show that anyone put pressure directly on Mr. Payne's back, that anyone put pressure on his neck. Well, that's the dispute, and then the district court said, you know, if we resolve the factual disputes in favor of the plaintiff, there was a knee on the rhomboid, which is the upper shoulder on the middle of the back. I don't know how to call it a rhomboid, but it's part of the upper back. And the same thing, there's the disputed, I mean, I think if you resolved, the district court said, if you resolve all the factual disputes in favor of the plaintiff, then there was pressure in two places on his back. So that's, given that fact, if it wasn't necessary to achieve the objectives that you're talking about, how is that not appearing excessive to achieve the presumptively, presumably legitimate objectives? I mean, that's the test. I think under Kingsley, it teaches that the objectively reasonable test under the 14th Amendment protects an officer who acts in good faith. Here, maybe they put a knee on a shoulder, they put it on a lower back for 17 seconds when they shouldn't have. Nothing in this record supports a finding that these officers were acting in bad faith, that they were trying to harm Mr. Payne, that their actions were gratuitous. And I'm out of time, and I want to jump to the second prong, if I can, the clearly established. I'll give you a couple minutes on rebuttal. I appreciate that. I appreciate that. You can address it on rebuttal. Okay. Okay. Thank you.  Good morning. May it please the Court. My name is Derek Larwick. I represent the estate of Landon Payne in this case. As this Court has noted, factual disputes are not the jurisdictional province of the Court right now. We're looking at errors of law, and so in considering errors of law, we're talking about what test applies, okay, in addition to the clearly established prong. The question about what test applies in this case has been changed a few times from Lane County's, or the deputy's, perspective. So in the trial court, as Judge McEwen noted, they moved for summary judgment. They cited this Court's decision in Espinoza, which recites the four Graham factors, okay, I think it also cites to Drummond, and those, they asked the Court to apply those factors. The Court did so. Each of the trial court's order has headings for each of the factors, and now they argue that Mr. Payne should have been continued, or considered, a post-arraignment pretrial detainee on page 30 of their opening brief, and they ask for factors that are more akin to those in Kingsley, okay. Kingsley was a case where the U.S. Supreme Court said that it was a 30-day detention, 14th Amendment analysis, yet it still applied the same factors in Graham, okay. It added a couple of additional factors, which we'll talk about in a moment, but any time that you're looking at excessive force in this setting, the Court does a multi-factor analysis to determine whether the force used was objectively reasonable. It doesn't matter if it's nominally under the Fourth Amendment or the Fourteenth Amendment, and— It would matter, I think you're saying, about looking at it as a post-trial detainee that generally imagines you in some kind of custody in a facility, and then there's all kind of other issues, right? That we don't have— That's correct. So different factors can apply in that setting, and that's what Kingsley— Kingsley expounded a couple additional factors, one of which was emphasized a moment ago. In the defendant's reply brief, however, on page 8, they abandon this pretrial detainee argument, and they now say that Mr. Payne was not yet a pretrial detainee, and they argue for a shocks-the-conscience standard, which is a non-search-and-seizure-related use of force. That was the first time, though, in the reply brief that we saw that argument. Exactly, and the citation was to Puente v. City of Phoenix, which is a tear gas and pepper spray dispersal case, so it— If we go with what they argued, but also just the framework that you're talking about, which is the Fourth Amendment, she was about to get to clearly established right, which is, of course, important here, and there are— Drummond is cited, but there are differences with Drummond, so would you define for us what you believe was the clearly established right? So in— Okay, I'm having to rearrange my argument just a little bit to talk about— Do you mind doing that? Of course. So Drummond articulated a description of the facts in that case, specifically that, quote, kneeling on the back and neck of a compliant detainee and pressing the weight of two officers' bodies on him, even after he complained that he was choking and in need of air, violates clearly established law, and reasonable officers would have been aware that such was the the case necessarily that established a clearly established right. It recognized that the right was already clearly established even before the conduct occurred in Drummond, and since that time, this court has also applied— Drummond and other courts as well, other circuits even— have applied Drummond for the principle that that right of a handcuffed person who's face down, posing no significant danger or risk to the officers, has a right not to be asphyxiated, not to be— not to have pressure applied on their back in that setting. There's— that if, you know, after analyzing the facts under a multi-factor analysis, as required by Graham, Lombardo, and Kingsley, and as the court did here, in some situations a reasonable jury could still find, based on these disputed facts, that the— that Mr. Payne's, you know, that an individual in that setting had their rights violated, and that that was a clearly established right. I mean this right has been around for a long time. As the— as the district court noted, the deputies had already been trained on this issue, so this is not something new to them, that they were not on notice that positional asphyxia was a real danger to handcuffed detain— detainees or arrestees, whatever you want to call them. Counsel, do you— do you agree that the district court treated Drummond and its progeny as the cases that guided these officers? On— on the prong of— yes, on the prong of clearly established, yes. And— and I think Judge McEwen got at this point, Drummond is significantly different factually, is it not, from our case? There are some factual distinctions, but as this— Major factual distinctions. But as I— as I understand it, the Supreme Court has emphasized that clearly established law and the actions of an officer cannot be analyzed at a very general level, because if so, you would read qualified immunity out. So you're looking at— you're— you're tacking close to the facts before you of this case. It seems to me that Drummond is not instructive to these officers. So we— I would disagree with that. Some of the factual distinctions that were— that were raised by— by my colleague were the amount of time that the officers were allegedly involved in— in the asphyxia conduct. So in Drummond, there's repeat— in Drummond, there's a mention of 20 minutes, but if you read the case, it does not clearly say that— that the detainee or the arrestee was in that position being asphyxiated for 20 minutes. It says af— 20 minutes after Mr. Drummond was taken down, another officer arrived. Mr. Drummond was hogtied. One minute later, he went unconscious. So the— the opinion itself does not clearly say that there was a 20-minute time span of asphyxia or— or positional compression. Another example is there were some factors that were mentioned. Like, for example, that the officers in Drummond were laughing, and that the U.S. Supreme Court has made it clear in— repeatedly, in— most notably in Graham and Kingsley, that subjective factors like that are not part of the objective reasonableness analysis. Uh, the argument that the defendant deputies in this case were not forceful, rude, or used an angry tone are also irrelevant. Well, what about the— the detective Pfeiffer who says to Santini, take— take it off or move it, and then he moves it immediately? Does that have any bearing on our analysis? Um, well, the— the first part of that statement is a— is evidence to show that Deputy Santini had his knee positioned in a place that Deputy Pfeiffer could at least assess was causing danger to Mr. Payne. Um, whether— whether Deputy Santini moves his knee, um, he's— the video clearly shows that he's still applying pressure. Might not be the same level of pressure as when he had his knee— his other knee elevated, and he was placing basically his whole body weight on Mr. Payne. But, um, all of that goes to the— the disputes of fact about how much force was actually being applied to Mr. Payne. There's, uh— And when you say there's a fact issue, what about Scott versus Harris? Are we allowed to view the Sally Ford video and the body cam, etc., and see— see what it shows? Exactly, yes. The— the— the various videos in this case show a lot of things, and there's things that are not apparent on the videos. For example, a moment ago there was a discussion about, uh, placing leg irons on Mr. Payne. That part cannot be seen from the Sally Ford video. There's too many deputies in the way. The testimony in the case from the deputy who was putting the leg irons on was that he had— had very little trouble putting the leg irons on. Um, and that was about all we have about leg irons. So there's a lot of speculation about what was occurring on that part of the video but that we can't see. As the district court also noted, there are other disputes despite the video evidence or perhaps because of the video evidence, including how much pressure was applied by these various deputies. Um, and those are issues for the jury to resolve later on in this case. The— the district court also noted that, um, citing the Supreme Court's Lombardo decision, several courts— this is a direct quote— several courts have cautioned against misinterpreting movement of limbs as active resistance when it may be more indicative of an individual's struggle to breathe, end quote. And that's what happened in this case is the district court determined that any struggle or any movement that was shown by Mr. Payne on the video, on any— either of the videos, um, there were jury questions remaining about whether that constituted active resistance, passive resistance, or just a struggle to breathe. This court has also applied— so getting back to your question about factual distinctions between Drummond, um, two points in response. One, this court recognized that the right to— of a prone, handcuffed detainee who was not actively resisting, not to have pressure applied on their back, that right existed before Drummond. So the facts as they occurred in Drummond do not have to be, um, exactly the same. And in fact, this court has applied Drummond and applied the clearly established prong of Drummond to lots of cases that are factually distinguishable, including, uh— and these are all cited in our brief— there was one case where the arrestee was not handcuffed. There's one where the, um— many of them are not field arrests. For example, there's a psychiatric correctional officer who was— so that must have been in a custodial environment where this person was— had pressure applied. So getting back slightly to the first prong, okay, um, the— even though at the trial court level, the parties agreed about using the Graham factors, the Espinoza factors or the Drummond factors, they're all the same. Um, now, because this is an interlocutory appeal, um, the deputies are arguing that there was an error of law and that the wrong factors were applied. So if we look to other factors that the Supreme Court has used in different cases— so we have a custodial continuum, basically, between, like, a field arrest and a post-arraignment pretrial detainee. And along that continuum are— is the case of Graham, obviously, and then you have Lombardo, which is basically a one-day detainee. And then you have Kingsley, which is a 30-day detainee. And the factors that the court lays out for those different settings are slightly different. So we— we've had very little discussion so far about the Lombardo factors. The Lombardo— Mr. Gilbert in the Lombardo case was a one-day detainee. So if anything, that's the case. If there's additional factors that the court should have considered— JUSTICE GINSBURG Well, let me— I'm having a little trouble because viewing him as, you know, a post-arraignment detainee, which most of these cases are, because he— on your continuum, he's post-arrest and pre-facility detained, correct? MR. GILBERT Correct, yeah. JUSTICE GINSBURG And what, in your view, is there anything about the Graham factors that wouldn't apply to that situation?  GILBERT Absolutely not. We think the court used the right test. The— this is a continuation of Mr. Payne's arrest. The things that the— that the jail deputies were doing at the time were searching his pockets, taking his temperature, which, as the court noted, they'd already completed, and placing leg irons on. This is— they're continuing the search and seizure of Mr.— of Mr. Payne. You know, search— they're actively searching him at— at the time. Before— and they have not taken custody of him. They haven't booked him in. There's disputes in the record about who had custody of Mr. Payne at that time. And so, as our brief laid out, even if the court— even if additional factors should have been considered by the district court, which, of course, were not raised by the deputies below, those factors probably would have been the Lombardo factors. And the Lombardo factors include whether there was evidence that the officers had been trained, that pressing down on the back of a prone subject can cause suffocation, whether there was well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk, and that struggles of a prone suspect may be due to oxygen deficiency rather than a desire to disobey officers' commands. And I mention those because if you read the district court's opinion, they not only cited Lombardo— the court— the court not only cited Lombardo and Kingsley, but also discussed many of those factors, even without being prompted, because they do relate into the Graham analysis. And I see that my time is just about up. So, with that, I would just ask that this court affirm the district court's denial of qualified immunity in this case. Thank you, counsel. Thank you, Inez. If we look at the district court's opinion, it demonstrates why the Graham fact— well, why the arrest factors, the seizure in the field factors are not relevant to the situation that the Lane County deputies found themselves in with Mr. Payne. The district court found that Mr. Payne's crimes were minimal. It determined there was a question of fact as to whether Mr. Payne was showing active or passive resistance. It determined it should have been apparent to the officers that Payne was emotionally disturbed. And it determined that Payne posed a minimal threat because he was handcuffed in the car. So, under that analysis, the court determined that very minimal force could be used on Mr. Payne because he posed very little risk and had committed no crime. But those considerations make no sense in this situation of this case. It is undisputed that at this time, EPD refused to cite and release Mr. Payne. We tried to do that. We got his warrant cleared and asked them. We don't want him. They couldn't go to the hospital. The White Bird, the mental health facility, was closed. Hospitals weren't taking mental health holds. EPD said you want him booked on a city charge in one of our beds. Contractually, legally, Lane County had to get him out of the car. They had to make an effort to have him medically cleared and booked into the jail. So, using no force was not an option. It made no difference to our deputies what the crime was. What made a difference was he was not responding to commands to get out of the car. He had to be removed from the car. And his study had mental health issues, correct? Um, it was clear from, I think, his appearance there that something was going on. But they had not been told. They hadn't been told about? What they had been told by EPD, which is also undisputed in the record, is that he was resisting in the field. He had been tased several times and that he was a combative. There was no evidence given, no information given by Deputy Solario of the Eugene Police that Mr. Payne had been coherent and calm before he was tased. So, that really, I guess that wasn't my question. Did they have an understanding or information that this was an arrestee with mental health issues? No, there's no evidence of that. Other than how he was behaving? What was self-evident? Yeah, and I think you can hear from the officers speaking to him, asking him what he was on. I think there was a presumption he was on drugs. So, back to the county's interest. They had to remove him from the car. Some force had to be used. Under the 14th Amendment test, was that force rationally related to getting him from the car? I don't think there's any dispute Santini and Fulton didn't get him from the car. So, they're not, that force is not at issue. And then he dropped his weight. So, they laid him to the ground. There was no other way to get his temperature when he's on the ground, moving about, than to hold him down for as little time as possible. And maybe it went further, but that doesn't make it excessive under the 14th Amendment. Maybe they could have gotten him up 15 seconds earlier. That doesn't... There was body weight force on his back necessary, even after his temperature was taken, right? Because that's what the district court said, if all factual disputes are resolved in favor of Mr. Payne. Even after, I mean, even after his temperature was taken, there was body weight force on his back for over a minute. So, Deputy Santini's use of force was 17 seconds on his back. So, he needs to be considered separately. These are individual claims. Sure. Then why was that necessary, even to take his temperature? I understand some restraint may have been necessary. Why was body weight force on his back necessary? Why weren't there reasonable alternatives of allowing a prone individual handcuffed, lying, you know, on the ground, giving him a moment to calm down? I mean, why was body weight force on his back, knowing the risk that is involved with that necessary to take his temperature? Yeah, and I don't think it was necessary. And I don't think anyone in this case argues that it was necessary. I think the argument is they were acting in good faith. They, the force that was applied was not punitive in nature. And under the 14th Amendment analysis, it is not a constitutional violation what the undisputed facts show happened in this case. And so, we're asking that this, the constitutional issue, be remanded to the district court for an analysis of him as, under the 14th Amendment, as a detainee, whether we call him pre-trial, post-trial, what trial. The fact is, he's already been seized. He is now being handed off to our deputies in a facility. And they have rules they have to follow before they can take him inside. Okay. Jumping to qualified immunity. I think you're over your time. I'll give you, just to make your point about. Thank you. Clearly established. Okay. Mr. Payne was in a facility. He was not out on the field. He was not initially being seized. Every reported case that the district court and the plaintiff rely on involve a person who is being seized for the first time out in the field. In Drummond, he was being seized allegedly for his own protection. He had committed no crime. So, the interests of the government are far different in a case where the person is out in the field, their liberty being taken for the first time, as opposed to someone in a facility who they're trying to get into the jail for booking purposes. The facility he's in is the Sallie Court, is that? Correct. He's in the Sallie Court there to be moved into the jail. So, you know, on this continuum, he's not in a facility. I agree. He's like out there in the garage, so to speak. Thank you. Thank you. I believe we are adjourned for the day. Thank you, counsel. All rise.
judges: McKEOWN, SUNG, Fitzwater